UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:17-cr-81 (AWT) |
| v. | : | |
| NESTOR SANTANA | : | DECEMBER 1, 2017 |

**MEMORANDUM IN AID OF SENTENCING**

**I.     INTRODUCTION**

On September 20, 2017 this defendant entered a guilty plea before The Honorable Sarah A. L. Merriam, United States Magistrate Judge to Count One of a two count indictment which charges the defendant with conspiracy to possess with intent to distribute and distribute 100 grams of more of heroin in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(B).  His plea was entered pursuant to a plea agreement dated September 20, 2017 on file with the Court, wherein the parties calculated the total offense level of 21 with a criminal history category of 6, placing the defendant within a sentencing range of 77 to 96 months.  In the plea agreement it was acknowledged that the defendant's prior drug felony history made him eligible for a sentencing enhancement pursuant to § 21 U.S.C. §§ 841(b)(1)(B) and 851 and per the plea agreement the Government declined to pursue that.

Related defendants are Mr. Ramon Gomez, Adele Bouthillier and James Butler.  Mr. Gomez was apparently operating some type of prostitution venture with Adele Bouthillier and is alleged to have provided heroin to Ms. Bouthillier who in turn provided the substance to Olivia Roark, who Mr. Gomez was employing as a part of his prostitution operation.  Ms. Roark

apparently ingested this heroin and expired as a result of an overdose, with the autopsy report concluding her death was a result of fentanyl toxicity with cocaine use being identified as an additional significant condition. Mr. Gomez told authorities that he obtained the heroin he provided to Ms. Bouthillier from Mr. Santana.

Mr. Butler's involvement in the case arose independently of Mr. Gomez's prostitution ring. Mr. Butler had apparently been ingesting heroin with Ms. Heather Hart of Montville, who expired as a result of a drug overdose on May 28, 2016. When interviewed by the police, Mr. Butler advised them that he and Ms. Hart would sometimes pool their money to buy heroin and had been doing so since approximately March of 2016. He further advised authorities that the last time that he had seen Ms. Hart she had been drinking from a box of wine. He indicated that he obtained his heroin from Mr. Gomez on a daily basis, and that Mr. Gomez typically provided him with ten $50.00 bags, each containing one-half a gram of heroin. Ms. Hart's cause of death, according to the medical examiner, was acute ethanol and fentanyl toxicity and Mr. Gomez told authorities that he obtained the heroin he provided to Mr. Butler from Mr. Santana.

In August and September of 2016, law enforcement orchestrated two controlled buys by a confidential informant from Mr. Santana, and from these transactions exhibit items weighing 47.1 gross grams including packaging and 53.8 grams including packing were obtained and these substances were tested and discovered to be heroin. Based on these controlled purchases law enforcement obtained a search and seizure warrant for Mr. Santana's residence located at 82 West Coit Street in New London. This search warrant was executed by law enforcement on September 29, 2016 whereupon they found eight individual baggies containing a beige like powder consistent

with heroin and $228.00 in U.S. currency. At the time of the search, the defendant actually showed the officers where the heroin was located as well as the plastic bags that were also found and admitted to officers that he received the seized money as a result of his heroin sales.

The defendant is presently serving a 25 month sentence imposed on May 9, 2017 by the New London Superior Court for relevant conduct alleged in Count One of the Indictment in this matter as indicated in paragraph 43 of the PSR.

The defendant agrees with the offense level and criminal history calculation contained in the PSR, but he disputes that he could be treated as a career offender pursuant to § 4B1.1 of the advisory sentencing guidelines as suggested in paragraph 28 of the PSR. Further, the defendant disputes that there should be an increased sentence pursuant to § 5K2.1 of the advisory sentencing guidelines as suggested in paragraph 86 of the PSR. For the reasons discussed below, the defendant urges the Court to impose a below guideline sentence of approximately 65 months so as to give credit to the defendant for the State's sentence he is presently serving for conduct charged in this Indictment.[1]

## II.   LEGAL STANDARD

A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In reaching its sentencing decision, the Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. See *United*

---

[1] Roughly calculated and without factoring in good time credits, the defendant has been in State custody for 13 months of this 25 month State sentence and has 12 months remaining on that sentence.

*States v. Booker*, 543 U.S. 220, 245-46 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007). The Court should begin by calculating the applicable Sentencing Guidelines range. However, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009).

Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in 18 U.S.C. § 3553(a). The Court may impose a below-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Seval*, 293 F. App'x 824, 836-37 (2nd Cir. 2008) (unpublished summary order) ("the Supreme Court has made is clear that sentencing judges may consider the general appropriateness of a Guideline range"). This is particularly true when considering Guidelines that are not based on the Sentencing Commission's traditional empirical and experiential study. See *Kimbrough*, 552 U.S. at 109.

Section 3553(a)(2) states that the purposes of sentencing include:

(A)   to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

To determine a sentence that best comports with these goals, the Court shoulder consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender;

(2) the kinds of sentences available; (3) the kinds of sentences and the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities amount similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

Most importantly, the Court should order a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

### III.   ARGUMENT

#### A.   Suggested Enhancements

The defendant does not dispute the factual background set forth in paragraphs 6 through 16 of the PSR. This defendant, however, had absolutely nothing to do with Mr. Gomez's prostitution operation nor did he know Adele Bouthillier, Melissa Crickmore or the decedent, Olivia Roark. In addition, the defendant did not know James Butler or the decedent, Heather Hart. He had no knowledge of the death of Ms. Roark until he read of Mr. Gomez's arrest in the newspaper in approximately June of 2016 and did not learn of Ms. Hart's death until his first meeting with the undersigned in January of 2017.

The defendant, himself, has a long history of drug abuse and heroin addiction starting when he first used marijuana when he was approximately 11 or 12 years old. He continued to use marijuana occasionally until his arrest in September of 2016 and has, in the past, experimented with Xanax. At the age of 16, he started using Percocet which escalated into daily use and continued for more than a year and thereafter he first started using heroin at the age of 19 and quickly began using this substance on a regular basis. This addiction has continued to plague him

5

since that time and was a significant contributing factor to his drug arrests and convictions in 2007, 2013 and 2016. The defendant did not inject heroin, but rather snorted it. Following his release from prison in February of 2016, he remained drug free for approximately two months while he held a job delivering furniture for a retail store with his brother, but once he was terminated from this position he reverted to heroin use two or three times every day. As he candidly indicated in his version of the offense, he sold heroin in order to support his own severe addiction. He would, in almost all cases, snort the very heroin he was selling since the main purpose of selling was to support his addiction and to be certain the heroin he purchased was the real thing. The quantities from the individual controlled buys were small, as was the quantity seized at his house together with only $228.00 in cash. Most of his sale quantities were one-half to one gram in size, but occasionally he would sell as much as 10 grams. He was not a large scale for-profit dealer. He did not add any substance to the heroin he sold and while he knows what fentanyl is, he has never seen it or knowingly possessed it. It is also worth noting that the defendant was also quite candid when the State law enforcement authorities executed the search and seizure warrant in September of 2016. In the course of that event, the defendant admitted to selling heroin and told the police where the contraband in his home was located.

This Court should not, as suggested in paragraph 86 of the PSR, enhance the defendant's sentence under the guideline range pursuant to § 5K2.1 of the United States Sentencing Guidelines. Concerning the demise of Ms. Roark, as previously indicated, the defendant had nothing to do with Mr. Gomez's prostitution operation. According to a statement of Adele Bouthillier provided in the discovery materials, Mr. Gomez did on May 28, 2016 provide a gram of heroin to her at the

Flagship Inn in Groton where she was staying with Mr. Roark. According to Ms. Bouthillier, Ms. Roark immediately began snorting the heroin and then they both fell asleep at approximately 1:00 p.m. Ms. Bouthillier woke up around 10:00 p.m. and saw that Ms. Roark was hanging almost completely off the bed so she moved her near the door or into the bathroom.[2] She was apparently "really out of it" and had some vomit coming out of her mouth, but Ms. Bouthillier did not call 911 for aid until approximately four hours later at 2:30 a.m. Certainly had Ms. Bouthillier acted with more haste in calling the emergency medical services the result may have been quite different. In addition, as indicated in his version of the offense, this defendant almost always snorted the heroin he was selling and never added anything to it. It would have been extremely unusual for him not to snort heroin he sold because he was an addicted daily user and the reason he was selling was to fund his habit. The fact that Mr. Santana suffered no ill effects from the particular heroin that he provided to Mr. Gomez invites the question as to whether or not Mr. Gomez or Ms. Bouthillier added the lethal fentanyl to the heroin in order to make it last longer as the currency for his prostitution enterprise. In addition, the medical examiner found the cause of death to be fentanyl toxicity, but also listed cocaine toxicity as an additional possible factor. The demise of Ms. Hart is similarly far removed from the conduct of this defendant. Again, in all likelihood, Mr. Santana, himself, snorted from the very same batch of heroin he provided to Mr. Gomez on that occasion as well. It is unclear from the discovery materials as to whether Ms. Hart snorted or injected the heroin, but as indicated by Mr. Butler in his statement, Ms. Hart was conscious and

---

[2] It is believed that she was moved into the bathroom to accommodate prostitution customers who showed up at the motel room.

drinking wine from a box when he last saw her. The medical examiner's report attributed her cause of death to both fentanyl toxicity and ethanol toxicity. In addition, the fact that Mr. Santana, himself, suffered no fatal ill effects from that batch of heroin which he, himself, likely snorted again invites the question as to whether or not Mr. Gomez or Mr. Butler added a quantity of fentanyl to the heroin after receiving it from Mr. Santana.

In both instances the defendant knew that his conduct in selling heroin to Mr. Gomez was illegal. He certainly did not foresee the death of anyone on account of his misconduct because he, himself, suffered no ill effects from his own use of the same drugs he conveyed to Mr. Gomez. In addition, the Government is not seeking an enhancement pursuant to § 5K2.1 and this Court should not impose such an enhancement in order to give effect to the plea agreement negotiated in good faith by the undersigned and the attorney for the Government. *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989).

This Court should also reject the suggestion in paragraph 28 of the PSR to consider an enhancement of the defendant's sentence as a career offender given his two prior drug felony convictions. First, the Government is not seeking this enhancement and to impose it would be contrary to and undermining of the plea agreement reached by the undersigned and the attorney for the Government. *United States v. Fernandez*, supra. Second, there is an insufficient record from which this Court could determine whether the two prior Connecticut drug convictions are qualifying predicate convictions under *United States v. Savage*, 542 F.3rd 959 (2d Cir. 2008). Third, the two prior Connecticut State drug convictions arguably do not qualify as "controlled substance" offenses. *Harbin v. Sessions*, 860 F.3rd 58 (2d Cir. 2017)

**B.     The Defendant's Background and Character**

The defendant accepts full responsibility for his actions and readily admits to his unlawful conduct leading to his conviction. He indicated in his version of the offense he has been abusing heroin since the age of 19, and following his release from prison in February of 2016, began again using and selling heroin approximately two months later in April of 2016. He continued to do so, principally in one-half gram and one gram quantities, up through and to the time of his arrest. He also admits to the sales in question to Mr. Gomez of the heroin which ultimately led to the death of Ms. Roark and Ms. Hart; however, to this day he is perplexed that the heroin he sold and also likely ingested would have a fatal effect on those young women and not a fatal or any other adverse effect on him. He never added any substances to the heroin he bought, used and sold. He recognizes that it is possible, but very unlikely, that he did not snort from the batch or batches which he sold to Mr. Gomez who in turn provided the substances to Ms. Hart and Ms. Roark or perhaps, he was just plain lucky. It is possible that Mr. Gomez or some other person added the lethal fentanyl to the heroin, but at the end of the day Mr. Santana is fully cognizant of the fact that his unlawful sales of heroin set in motion a chain of events that ultimately resulted in fatal consequences for two young people and for that he is truly sorry.

From the PSR it is apparent that Mr. Santana, who is only 30 years of age, has accomplished very little in his life. He has no GED or high school diploma and a work history that can be described only as sporadic at best. One positive thing he has accomplished in life is being the father of his daughter, Gabrielis, presently age 9, to whom he remains devoted. Certainly his addiction to heroin for the last 11 years up until the time of his incarceration in November of 2016

9

has been a very substantial negative factor in his life. He recognizes that starting in his early teenage years he has made numerous poor decisions over time about the people he was associated with and activities he was engaged in. Without a doubt, the fact that there was no father figure in his life was very damaging during his formative years; however, in an effort to get him away from the bad and perceived outright dangerous influences and environment he was living in in Puerto Rico his mother sent him to Connecticut at age 16 to live with his brother who was only six or eight years older than him. Again, he had no strong male supervision and continued to make poor decisions starting in 2007, at age 19, he began to accumulate numerous convictions for which he received jail sentences of 15 months, one year, 18 months, 30 months and 25 months. Not surprisingly, the commencement of his criminal history coincided with the commencement of his heroin addiction at age 19.

Remarkably, the defendant has never undergone any significant drug treatment either while incarcerated or at liberty on probation. In his self-assessment, he described himself as a good person. Having interacted with him on several occasions over the last several months he certainly comes across as an outwardly courteous and pleasant individual. He recognizes at this point that if he is going to remain outside the criminal justice system in the future he must remain drug free and be a good person. As he advised the probation officer, he feels much better and healthier now that he has been drug free since his initial incarceration in this matter in November of 2016 and wants to change his environment and not return to New London. He correctly believes that he could do better if he were to remain drug free in a different geographic location free of his previous associations.

In determining the appropriate the sentence, the Court must give great weight to subparagraphs (A), (B) and (C) of the § 3553(a)(2) factors given the defendant's criminal history and offense conduct. There is an obvious need for the Court's sentence to reflect punishment and promote respect for the law. The Court must also consider, however, the need to provide the defendant with needed educational or vocational training as well as medical care which should include substance abuse treatment. Without a doubt the defendant will have little chance of being successful following his sentence unless he is able to remain drug free. Part of achieving that goal can and should come while incarcerated in the form of treatment and the other part of that aspiration needs to come from the defendant fully committing to being drug free. Reflecting on his life and the many months of confinement, and on his daughter, the defendant is prepared to make that personal commitment. In addition, the defendant is greatly in need of a GED and vocational training as he has no specific job skills other than that of a laborer. He will need to find some meaningful employment to support himself and his daughter and to remain drug free. A sentence of 65 months is significant punishment that will promote respect for the law. It provides ample time for drug treatment and vocational training. It is more than twice the length of any previous sentence the defendant has received. It represents a sentence at the low end of the defendant's guideline range with approximate credit for a state sentence imposed for relevant conduct in this case by the New London Superior Court.

## IV.  CONCLUSION

For all of the above reasons the defendant respectfully requests the Court to consider a sentence of 65 months.

                              THE DEFENDANT
                              Nestor Santana

                              By _____
                              John D. Maxwell, Esquire
                              Brown, Paindiris & Scott, LLP
                              2252 Main Street
                              Glastonbury, CT 06033
                              Fed. Bar No. Ct00051
                              Phone:  (860) 659-0700
                              Fax:  (860) 659-4382
                              E-mail: jmaxwell@bpslawyers.com

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**CERTIFICATE OF SERVICE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:17-cr-81 (AWT) |
| | : | |
| v. | : | |
| | : | |
| NESTOR SANTANA | : | DECEMBER 1, 2017 |

    This is to certify that on December 1, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                      THE DEFENDANT
                                      Nestor Santana

                                      By _____
                                      John D. Maxwell, Esquire
                                      Brown, Paindiris & Scott, LLP
                                      2252 Main Street
                                      Glastonbury, CT 06033
                                      Fed. Bar No. ct00051
                                      Tel. No. (860) 659-0700
                                      Fax No. (860) 652-4382
                                      Email: jmaxwell@bpslawyers.com